**HYDROTHERMAL ENERGY
CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 116–87C.

United States Claims Court.

April 17, 1992.

**8**

Fadlo Mousalam, San Jose, Cal., for plaintiff.

Steven L. Schooner, with whom were Asst. Atty. Gen. Stuart M. Gerson, David M. Cohen, Director, and Mary Mitchelson, Asst. Director, Washington, D.C., for defendant. Harvey S. Brosler, Jacob D. Vreeland, and Lauren A. Springer, of counsel.

## OPINION

ANDEWELT, Judge.

In this government contract action filed pursuant to the Contract Disputes Act, 41 U.S.C. § 601 *et seq.* (CDA), plaintiff, Hydrothermal Energy Corp. (HEC), a developer of geothermal energy resources, contracted with the United States Department of Energy (DOE) to develop a geothermal heating system in Reno, Nevada. DOE subsequently terminated the contract for the convenience of the government and asserted a right to control the geothermal wells and related licenses and permits associated with the project.

In the instant action, plaintiff seeks to recover funds to which it alleges it was entitled under the contract, including costs relating to defendant's termination for convenience. Plaintiff also seeks a declaratory judgment that it is owner of the geothermal wells and related licenses and permits or, in the alternative, plaintiff seeks breach of contract damages for the loss of those wells and related rights. In response, defendant not only contests plaintiff's claims to additional monies under the contract, but also counterclaims for the return of certain funds it has paid plaintiff under the contract. In addition, defendant contends that this court lacks jurisdiction to provide any declaratory relief with respect to ownership of the wells and related licenses and permits and, in any event, that defendant is the rightful owner of these assets.

### I.

In April 1978, in an effort to promote the development of geothermal energy, DOE issued Program Opportunity Notice ("PON") number EG–78–N–03–2047, entitled "Field Experiments for Direct Uses of Geothermal Energy." The PON requested submission of proposals involving DOE financial support for projects demonstrating commercially viable uses of geothermal energy, such as heating and cooling for residential and commercial buildings.

On July 14, 1978, in response to the PON, plaintiff, through its president, Dr. David J. Atkinson, submitted a proposal to use hot water from the Moana Known Geothermal Resource Area in Reno, Nevada, for space and water heating. This proposal led to the instant contract, which was entered approximately one year later, on June 25, 1979. The objective of the contract, as described in the original "Statement of Work," was to "design, construct and successfully operate a geothermal heating system at the Sundance Apartment Complex in Reno, Nevada." The site was later changed to Salem Plaza Condominiums, also in Reno. *Inter alia*, the contract required HEC to obtain the necessary water rights and construction permits to drill two wells.

As originally awarded, the contract provided funding for the first phase of the total project. The remaining tasks necessary to make the project operational were left open and were to be funded through future contract modifications by agreement of the parties. The total estimated cost of the first phase of the contract was $232,339. Article III of the contract set forth a cost-sharing arrangement whereby the government would fund 97.78 percent of the total costs incurred, not to exceed $227,178, and HEC would fund the remaining 2.22 percent. The original period of performance ran from June 25, 1979, through April 21, 1980, with the parties having an option to extend the contract for additional periods.

The parties agreed to several contract modifications. The period of contract performance was extended, additional work was included, and funding was increased. Ultimately, the total "estimated cost" of the contract under Article III increased to $990,466 and the government's proportionate share was reduced slightly, to 96.82 percent. As of the last modification prior to termination, the government's maximum share increased to $958,969. In the modifications, the government allotted a total of $935,300 to the project.

Throughout the term of the contract, plaintiff regularly submitted project status reports to DOE and apprised it of plaintiff's progress and costs allegedly incurred in connection with the various contract tasks. In a letter dated December 9, 1982, plaintiff informed the government that all but $133,929 of the original estimated cost had been expended and that, for a variety of reasons, an additional $375,518 over the estimated cost would be needed to complete the project. In telephone conversations on February 4 and February 8, 1983, DOE informed plaintiff that funding for the project was extremely short. In a February 15, 1983, letter, project manager Kenneth R. Zahora informed plaintiff that DOE was considering terminating the contract unless a new cost-sharing arrangement could be reached. Zahora advised plaintiff to submit any new cost-sharing proposal within the next two weeks. In response, plaintiff re-examined the costs and determined that all were necessary. Plaintiff then made numerous efforts to find additional private funds for the project.

On May 11, 1983, DOE issued Modification M009, which ordered plaintiff "to stop all work presently being performed under the contract." In a letter dated October 11, 1983, the contracting officer notified plaintiff that the contract "is hereby terminated for the convenience of the Government" and instructed plaintiff to submit a settlement proposal.

Prior to the termination, plaintiff had billed $936,900 and had received payments of $924,693 from DOE under the contract. On October 4, 1984, plaintiff submitted a certified final settlement proposal seeking $611,587 for termination costs under the contract; this figure included the $12,207 amount previously billed but not yet paid for the period of contract performance. DOE audited both plaintiff's entitlement to the funds it already had billed and its purported termination costs. On October 9, 1985, DOE issued its final audit of plaintiff's billed costs for work performed prior to Modification M009. The audit concluded that of the $936,900 billed, $189,626 was unallowable and $502,249 was unsupported. Furthermore, DOE issued a separate audit on November 8, 1985, regarding plaintiff's termination claim. This audit concluded

that $305,622 of the costs were unallowable and all remaining costs were unaudited because of inadequate documentation or other support.

On March 4, 1986, the contracting officer issued a final decision. The contracting officer denied plaintiff's termination settlement proposal in its entirety and concluded that plaintiff had been overpaid in the amount of $691,875 for work performed under the contract. The contracting officer declared that DOE "has full right and title to the geothermal wells including the licenses and permits related to those wells." On March 4, 1987, pursuant to 41 U.S.C. § 609, plaintiff filed the instant action seeking to recover damages and seeking a declaratory judgment regarding its ownership of the geothermal wells and related licenses and permits. In response, defendant filed a counterclaim seeking amounts it allegedly overpaid to plaintiff.

At trial, the parties disputed numerous factual and legal issues. Those issues can be divided into three groups. First, the parties disagree as to whether there was an applicable ceiling on the total payments due plaintiff under the contract, and if there was, the amount of that ceiling. Second, regardless of any applicable ceiling, the parties dispute the extent to which plaintiff actually incurred certain costs, and the extent to which certain incurred costs are allowable under the contract. Third, the parties disagree as to ownership of the wells and related rights. In this decision, the court will dispose of the first and third issues. Before addressing the second issue, the court requires additional briefing. The substance of such briefing will be set forth in a separate order.

1. Paragraph (c) provides:

If at any time the Contractor has reason to believe that the costs which he expects to incur in the performance of this contract in the next succeeding 60 days, when added to all costs previously incurred, will exceed 75 percent of the total amount then allotted to the contract, the Contractor shall notify the Contracting Officer in writing to that effect. The notice shall state the estimated amount of additional funds required to continue performance for the period set forth in the

## II.

The dispute between the parties as to the existence of a contractual ceiling on costs focuses on the Limitation of Funds (LOF) clause contained in the "General Provisions" of the contract. In paragraph (d), the LOF clause sets the general guideline that the contractor is not entitled to monies above the amount that had been allotted to the contract. Paragraph (d) provides, in pertinent part:

(d) Except as required by other provisions of this contract specifically citing and stated to be an exception from this clause, the Government shall not be obligated to reimburse the Contractor for costs incurred in excess of the total amount from time to time allotted to the contract.... No notice, communication, or representation in any other form or from any person other than the Contracting Officer shall affect the amount allotted to this contract. In the absence of the specified notice, the Government shall not be obligated to reimburse the Contractor for any costs in excess of the total amount then allotted to the contract, whether those excess costs were incurred during the course of the contract or as a result of termination.

In paragraph (c), the LOF clause provides a mechanism by which the contractor can terminate the contract in the event the amount allotted is less than the amount "that will be required for the timely performance of the work."[1]

The parties executed Modification A007, effective September 17, 1981, which specifically invokes the LOF clause and makes an allotment to the contract of $935,300. That modification provides that "[p]ursuant to

Schedule.... [T]he Contractor will advise the Contracting Officer in writing as to the estimated amount of additional funds, if any, that will be required for the timely performance of the work under the contract.... If, after such notification, additional funds are not allotted by the end of the period set forth in the Schedule or an agreed date substituted therefor, the Contracting Officer will, upon written request by the Contractor, terminate this contract pursuant to the provisions of the Termination clause on such date.

the clause of the General Provision entitled 'Limitation of Funds,' the amount of $935,300 has been allotted and is available for payment for the contractor's costs of performance under this contract." Defendant never issued, and plaintiff never received, any notice under the LOF clause subsequent to Modification A007 that increases this allotment. Defendant contends that the LOF clause controls and establishes a $935,300 ceiling in that DOE is "not ... obligated to reimburse the Contractor for any costs in excess of the total [ ($935,300) ] amount then allotted to the contract, whether those excess costs were incurred during the course of the contract or as a result of termination."

In response, plaintiff makes a series of arguments in an effort, in effect, to crack the LOF ceiling. But ultimately, none is successful.

### A.

■ Plaintiff argues that the contract's Limitation of Costs (LOC) clause,[2] rather than the LOF clause, controls. Since the estimated total cost of the contract was $990,466, defendant's 96.82 share would be $958,969. If the LOC clause controlled, defendant would be obligated for the full $958,969. As explained above, if the LOF clause controlled, defendant would be obligated for only $935,300, or $23,669 less. The LOC clause is contained in the "Schedule" of the contract while the LOF clause is contained in the contract's "General Provisions." Plaintiff asserts that pursuant to Article VI of the contract, entitled "Order of Precedence," since the LOC clause appears in the "Schedule," it takes prece-

---

**2.** The LOC clause provides, in pertinent part:

(a) It is estimated that the total cost to the Government for the performance of this contract (exclusive of any fee) will not exceed the estimated cost to the Government set forth in the Schedule, and the Contractor agrees to use his best efforts to perform the work specified in the Schedule and all obligations under this contract within such estimated cost to the Government plus the share of the cost of performance agreed to be borne by the Contractor....

(b) Except as required by other provisions of this contract, specifically citing and stated to be an exception from this clause, the Govern-

---

dence over the LOF clause appearing in the "General Provisions." [3]

But the "Order of Precedence" provision applies only "[i]n the event of inconsistency in this contract." Here, there is no inconsistency. The first paragraph of the LOF clause states that it "automatically applies in lieu of [the LOC clause] in the event, and only during such period of time, or times, as funds are specifically designated or shown in the schedule as allotted pursuant to this clause." Here, such an allotment had occurred. There is nothing in the LOC clause that is inconsistent with this term in the LOF clause and, hence, pursuant to both clauses, the LOF clause controls.

### B.

■ Next, plaintiff contends that the ceiling contained in the LOF clause does not apply because an additional $475,000 was allotted to the contract by an act of Congress. Plaintiff presented this argument for the first time during trial and in its post-trial brief. But plaintiff does not cite any statute that allotted additional money to the instant contract. Instead, plaintiff relies upon statements by Senators Laxalt and Hatfield reported in the Congressional Record, 129 Cong.Rec., S11156–57 (daily ed. July 29, 1983), which indicate, at most, that Congress, in some undefined way, instructed DOE to devote $475,000 of its fiscal year 1983 funds to complete "the geothermal heating project in the Moana area of Reno" by "developing a completion plan which will be acceptable to [DOE] and to the project's private sponsors."

---

ment shall not be obligated to reimburse the Contractor for costs incurred in excess of the estimated cost to the Government set forth in the Schedule[.]

**3.** Article VI provides:

In the event of inconsistency in this contract, the inconsistency shall be resolved by giving precedence in the following order: (A) Schedule, (B) Statement of Work, (C) General Provisions, (D) any other provisions of this contract, whether incorporated by reference or otherwise, and (E) the Contractor's technical proposal if incorporated in this contract by reference or otherwise.

The Senators did not state therein what the plan must contain or direct that any funds go specifically into plaintiff's contract. Moreover, even if Congress had, through passage of a statute, obliged DOE to perform certain acts with respect to the instant contract, a failure by DOE to perform those acts would not necessarily amount to a breach of contract. This is a contract action and to establish entitlement to funds based on a breach of contract theory, plaintiff must show that the government breached an obligation undertaken in the contract. There is no obligation in the contract that relates to congressional expressions of the type involved here.[4] The LOF clause provides that "the Government shall not be obligated ... unless and until the Contracting Officer has notified the Contractor in writing that such allotted amount has been increased." The contracting officer never allotted the funds mentioned in the Congressional Record upon which plaintiff relies.

### C.

■ Plaintiff argues that even if a $935,-300 contract ceiling applied at one time, defendant subsequently waived its right to invoke the LOF clause. Plaintiff asserts generally that defendant knew from the beginning the project would cost more than the amount allotted, the limited amount allotted was purely a result of DOE budget restrictions, and the amount allotted was never intended to be sufficient to pay for all of the tasks listed in the contract's "Statement of Work." But even if plaintiff proved these allegations, no waiver would result. The contract terms are unambiguous and give DOE the discretion to react to such budget restrictions by not continuing the project or by limiting increases in its funding. Article I, entitled "Scope of Work," states that plaintiff "shall conduct a program ... to accomplish the work set forth in: Exhibit I—Statement of Work [and] Exhibit II—Reporting Requirements." Article III specifies the estimated

cost of this work and Article V states that "[a]t the sole option and discretion of the Government," the contract may receive additional funding. Plaintiff has produced no evidence that DOE ever unilaterally abandoned its right to insist that plaintiff perform the work to which the parties agreed for the amounts stated in the contract documents. As explained above, plaintiff was protected from having to perform the entire contract work for the amount allotted by paragraph (c) of the LOF clause, which permitted the contractor to secure termination of the contract if the amount allotted was insufficient to perform the contract work.

### D.

■ Plaintiff argues that DOE should be estopped from relying on the LOF clause because the government led plaintiff to believe that that clause would not be invoked. It is an open question as to whether equitable estoppel will ever lie against the federal government. *See, e.g., OPM v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). But, in any event, to prevail on a claim of equitable estoppel, a party, at a minimum, must demonstrate four facts:

(1) the party to be estopped must know the facts, *i.e.,* the Government must know of the overrun; (2) the government must intend that the conduct alleged to have induced continued performance will be acted on, or the contractor must have a right to believe the conduct in question was intended to induce continued performance; (3) the contractor must not be aware of the true facts, *i.e.,* that no implied funding of the overrun was intended; and (4) the contractor must rely on the government's conduct to its detriment.

*American Electronic Laboratories, Inc. v. United States,* 774 F.2d 1110, 1113 (Fed. Cir.1985). Herein, plaintiff has not met all of these requirements. For example, plain-

---

4. Of course, to the extent Congress did pass a statute and that statute was interpreted as "money mandating," the statute would itself serve as a basis for a Claims Court action seeking to

recover that money. *United States v. Testan,* 424 U.S. 392, 401–02, 96 S.Ct. 948, 954–55, 47 L.Ed.2d 114 (1976).

tiff did not satisfy the second requirement by demonstrating that DOE or its representatives engaged in conduct that was intended to induce, or reasonably could be interpreted to induce, the impression that the LOF clause did not control or that all of plaintiff's costs would be reimbursed. In addition, plaintiff failed to prove reliance. Dr. Atkinson's signature on Modification A007, which plainly invokes the LOF clause, contradicts plaintiff's assertion that it believed the LOF clause did not apply or that it relied upon a promise of full funding.[5]

### E.

■ In addition to arguing broadly under a waiver or estoppel theory that the LOF clause does not apply, plaintiff points to certain acts by DOE personnel that it alleges warrant a limited increase in the LOF ceiling. But none of these individual acts, taken alone or together, warrants disregarding the unequivocal terms of the LOF clause. For example, plaintiff asserts that the project manager constructively changed the contract when he directed plaintiff, both in his February 15, 1983, letter, and in a number of earlier telephone conversations, to propose a plan for minimizing the costs of the project. Plaintiff alleges that in the months following these communications, its president directed his efforts, at a cost of $42,000, to raising additional funds.

5. Plaintiff argues that the parties always relied upon the LOC clause and that this established a course of dealing binding on defendant. Plaintiff points to its monthly cost management reports in which plaintiff consistently and without contradiction stated that "government funding" was $958,969. However, regardless of whether the LOC clause took precedence prior to September 17, 1981, the date of Modification A007, the LOF clause took precedence upon that date and remained in effect thereafter.

Plaintiff also asserts that the LOF clause was deleted in paragraph (6)(b) of Modification A006. But the clear wording of Modification A006 shows that it deleted Clause 22 (Utilization of Labor Surplus Area Concerns) of Article VIII of the Schedule, not Clause 22 (the LOF clause) of the General Provisions.

6. Plaintiff contends, in effect, that it dealt with Zahora on a day-to-day basis and, therefore, reasonably presumed that he had the necessary

But this argument is deficient for a number of reasons. First, the project manager's letter is not, and cannot reasonably be interpreted to be, a direction for plaintiff to engage in any extensive or costly efforts to raise funds. The letter refers to "minimizing costs" and requests a response to suggested ways of reducing the costs "as soon as possible" because "[a] decision on termination is expected to be made" within the following two weeks. By requesting such a quick response, it is not apparent that the project manager envisioned any major fund raising effort on plaintiff's part. In addition, the letter does not indicate that the government would authorize any additional funds above the ceiling contained in the LOF clause to enable plaintiff to conduct a search for additional funds. The letter refutes any impression to the contrary which plaintiff alleges it received from earlier telephone conversations.

Second, in any event, the letter was sent by the project manager, Kenneth Zahora, not a contracting officer. Zahora lacked actual authority under Article IV to modify the contract by creating a new funding allocation or by adding a new task to the "Statement of Work." Plaintiff did not claim that Zahora presented himself to plaintiff as a contracting officer. Nor did plaintiff show that it was reasonable to believe that Zahora held the requisite contracting authority.[6]

contracting authority. But Article IV of the contract states that work under the contract "is subject to the surveillance and written technical direction of a 'Technical Manager.'" Zahora testified that his role was "to monitor the technical, the progress, the schedule and the costs." As the technical manager, Zahora's authority was expressly limited by Article IV to "not impose tasks or requirements upon the contractor additional to or different from the general tasks and requirements" contained in the "Statement of Work."

Plaintiff relies upon *United States Federal Engineering & Manufacturing, Inc.,* ASBCA 19909, 75–2 BCA ¶ 11,578 (1975), for the proposition that a technical manager can bind the government. However, as that decision makes clear, the holding extends only to changes that correct defective government-provided specifications which the government is independently obligated to correct.

### F.

Plaintiff next argues that this court should increase the ceiling contained in the LOF clause by $88,200 to correct a mutual mistake made by the parties. The alleged mistake involves the second well. Drilling of the second well was included in Task 8 of the "Statement of Work" in the original contract. It was deleted from the contract in Modification A005 but restored as a reimbursable contract task, after the well was already drilled, in Modification M008. Plaintiff alleges that, to reflect the elimination of the work on the second well, the funding in Modification A005 was $88,200 less than it otherwise would have been. Plaintiff alleges that the parties mistakenly failed to add this funding back in when the work was added back to the contract in Modification M008. Defendant agrees that a mistake was made but disagrees as to what that mistake was. Defendant argues that the deletion of the second well was a mistake, but that there was never any money deducted from the contract to reflect that deletion and, hence, it was appropriate not to add any money to the contract when work on the second well was reinstated.

The evidence presented at trial supports defendant's argument. Drilling the second well was an important part of the tasks outlined in the original contract. Yet, when the task was deleted, there was no decrease in the money allotted to the contract in Modification A005. To the contrary, the money available was increased. In addition, plaintiff continued work on the second well even though work on the well had been deleted. Moreover, Modification M008 acknowledges that Modification A005 had "inadvertently deleted Task 8" from the "Statement of Work" but does not suggest that the funding relating to the second well had also been deleted. Indeed, plaintiff continually performed work as though it believed the second well remained part of the project and plaintiff signed Modification M008 which added the second well back to the project with no increase in funding.[7]

### G.

Plaintiff contends that the ceiling contained in the LOF clause, in effect, should be increased because Modification A007 required the additional task that plaintiff apply Davis–Bacon Act wage rates to its subcontractors. Modification A007 increased the contract total cost estimate by $29,911 to cover the Davis–Bacon costs and, thus increased the government's share by $28,960. But the modification allotted only $5,291 of this share to the contract, leaving $23,669 of the government share unallotted. Plaintiff asserts that these unallotted funds should be added to the contract. But, as explained above, the LOF clause superseded the LOC clause as of the date of Modification A007. The LOF clause provides that the total allotment, not the total cost, controls and only the contracting officer can modify the allotment. Here, the contracting officer never increased the allotment beyond $935,300.

### H.

Plaintiff argues next that, even if the government's total obligation is limited to $935,300, DOE payments to plaintiff as reimbursements for certain heat exchangers, controls, and other uninstalled items, should not be counted against that ceiling because the items constituted "capital equipment." The government secured possession of these items from a warehouse following the termination. But this argument is relevant not to the existence of a cost ceiling, but rather to the determination of what costs are properly billed and paid against that ceiling. The court will address that issue in a subsequent decision

---

**7.** Plaintiff asserted at trial that the second well drilled was actually the third well. However, Task 12 of the "Statement of Work" stated that "[i]f a third well is necessary for the project it will be drilled" but no additional funding was provided to cover this contingency. Plaintiff's exhibit 79.10, entitled "Record of Negotiated Procurement Action," dated July 10, 1981, shows that the parties deleted $88,200 from HEC's proposal for "elimination of third well." The evidence shows that, regardless of how plaintiff chooses to label the wells, the contract provided government funding for only two, and not three, wells.

when it addresses the issue of which costs are allowable.[8]

## III.

At trial, plaintiff for the first time presented the argument that plaintiff should be entitled to judgment because defendant's termination for convenience was in bad faith. Plaintiff contends, in effect, that the termination for convenience was improperly undertaken to permit the owners of Salem Plaza Condominiums, and others, to appropriate the benefit of the work done by plaintiff. Plaintiff asserts that Zahora's replacement, Anthony J. Adduci, personally disliked Dr. Atkinson and sought to give the geothermal system to the owners of Salem Plaza and to award a contract for completion of the system to a Nevada company, Chilton Engineers. Plaintiff argues that to accomplish these ends, Adduci took various actions and presented biased reports to the contracting officer to lead the contracting officer to terminate plaintiff's contract.

■ There are a number of theoretical and analytic defects in plaintiff's bad faith termination argument. It will suffice to note only two. First, plaintiff presented its bad faith termination for convenience argument too late. Plaintiff did not make this argument during the pretrial process. The pertinent obligations of the parties in preparing a case for trial are set forth in Appendix G of this court's rules. Paragraph 11 of Appendix G requires plaintiff to file a "Memorandum of Contentions of Fact and Law" which "shall contain a full but concise exposition of plaintiff's theory

of the case and a statement in narrative form of what plaintiff expects to prove." Paragraph 15 requires the parties to file a joint statement of issues of fact and law and precludes the parties from offering evidence not directed at these issues. Paragraph 15 states, in pertinent part:

> Issues should be set forth in sufficient detail to enable the court to resolve the case in its entirety by addressing each of the issues listed. The statement of issues shall control the admissibility of evidence at trial and evidence will be deemed to be irrelevant unless it pertains to one or more of the issues.

Here, plaintiff did not mention defendant's alleged bad faith termination in either its "Memorandum of Contentions of Fact and Law" or the parties' joint statement. Hence, under Appendix G, evidence on this issue was not admissable at trial.[9] Plaintiff contended at trial that it had not known about defendant's alleged bad faith actions until plaintiff took depositions from Adduci and other DOE employees. But discovery in this action closed in October 1989 and the depositions to which plaintiff refers were taken over one year before trial. Plaintiff had ample opportunity through discovery to evaluate the issue of bad faith.

■ Second, and more fundamentally, plaintiff failed to prove any bad faith on defendant's part.[10] While Adduci admitted that he disliked Dr. Atkinson because Dr. Atkinson had conducted business in a manner that Adduci believed was inappropriate, plaintiff failed to prove that this personal

8. Plaintiff also argues that there was approximately $22,000 in "unpaid contract value." This apparently refers to the difference between the government share of $958,969 and the allotment of $935,300. As explained above, the allotment controls. Plaintiff also alleges that it is entitled to the "unpaid invoice" ($12,207), stop work period costs ($67,884), termination period costs ($204,957), and net costs incurred but not billed during performance of the contract ($85,004), but presents no reason beyond those discussed and rejected above, as to why these costs are not subject to the ceiling.

9. In a June 28, 1990, order, this court required the parties to file their pretrial submissions pur-

suant to Appendix G. The only government misconduct plaintiff identified in its filing was "mishandling" of the contract by failing promptly to reimburse costs, and improperly terminating the contract because DOE was under congressional pressure to finish the project. Plaintiff did not pursue the latter ground at trial; in fact, plaintiff argued at trial that Congress wanted DOE to fund HEC, not abandon HEC. Plaintiff cited the former ground at trial to justify certain increased costs, but it never tied this ground to the termination issue.

10. At trial, the court permitted the testimony as to bad faith but reserved judgment as to its admissibility.

feeling in any way affected Adduci's job performance or led him to deceive others at DOE. Plaintiff also failed to demonstrate that the contracting officer was in any way biased against plaintiff. To the contrary, there is extensive evidence in the record to support the contracting officer's determination that it was in the best interest of the government to terminate plaintiff's contract and attempt to complete the project with another contractor. Plaintiff had not even come close to completing the contract tasks within the budgeted time and at the budgeted costs. Indeed, in its December 9, 1982, letter, plaintiff listed a litany of allegedly unexpected difficulties and indicated that the project would be completed substantially behind schedule and would cost an additional $375,518. Moreover, plaintiff also failed to give the government the notice required under the LOF clause that costs would soon reach 75 percent of the allotted funds.[11]

### IV.

In paragraph 3 of the prayer for judgment in the complaint, plaintiff requests that this court make a declaratory determination that the contract granted plaintiff full right and title to the geothermal wells and related licenses and permits. In effect, plaintiff asks this court to reverse the contracting officer's March 4, 1986, determination that the wells and related licenses and permits belong to defendant. In making this request, paragraph 3 seeks purely declaratory relief. There is no specific allegation in the complaint that the contracting officer's decision with respect to title had produced any monetary damages.

■ Defendant contends that this court lacks jurisdiction to entertain such a claim for pure declaratory relief. Defendant is correct. In *Placeway Constr. Corp. v. United States*, 920 F.2d 903, 906 (Fed.Cir.

1990), the Court of Appeals for the Federal Circuit concluded that this court lacks jurisdiction to grant purely declaratory relief in contract cases, except in preaward contract cases under 28 U.S.C. § 1491(a)(3). This obviously is not a preaward case.

Plaintiff cites various cases which, plaintiff asserts, indicate that the departmental boards of contract appeals can review and overturn a contracting officer's decision as to title. *See, e.g., Claude E. Atkins Enterprises, Inc. v. United States*, 15 Cl.Ct. 644 (1988). Based on those cases, plaintiff contends that the Claims Court should be held to have equivalently broad jurisdiction. But in *Overall Roofing & Constr., Inc. v. United States*, 929 F.2d 687 (Fed.Cir.1991), the Federal Circuit specifically rejected such a theory of coextensive jurisdiction between the Claims Court and agency boards. The court stated: "[The Contract Disputes Act] contemplates that boards will hear appeals of decisions, but the Claims Court will only entertain suits on claims, and those claims are limited to demands for money presently due and owing." *Id.* at 689.

■ This court does have authority to issue rulings of law declaring the rights of parties under a contract where such rulings are necessary to the resolution of a claim for money presently due and owing. *Pauley Petroleum, Inc. v. United States*, 219 Ct.Cl. 24, 37–38, 591 F.2d 1308, 1315 (1979), *cert. denied*, 444 U.S. 898, 100 S.Ct. 206, 62 L.Ed.2d 133 (1979). But under the rationale of *Overall Roofing*, this court cannot issue a declaration of rights under a contract unless such a declaration is a part of the determination of a monetary claim. In apparent recognition of its lack of a basis for its request for naked declaratory relief, at trial and in its post-trial brief, plaintiff requests damages of $1,300,000, the alleged full value of the geothermal system

---

11. Plaintiff argues that its monthly cost reports gave this notice since the cumulative percentage of the budget spent as of any given month could easily be calculated from the reports. However, under paragraph (c) of the LOF clause, the contract clearly requires a separate written notice that states that current costs, *plus* costs plaintiff expects to incur over the *succeeding* 60 days, will equal 75 percent of the allotment. Plaintiff's expectations of future costs cannot be calculated or inferred from reports of past expenditures. Plaintiff's failure to give this notice is further evidence of inadequate management by plaintiff and supports the conclusion that selection of another contractor was in the government's best interest.

it had developed, "as compensation for the loss of the geothermal system." Plaintiff then argues that this court has jurisdiction over the issue of title to the wells and permits because the title question is now "tied" to a request for a money judgment.

But plaintiff presented its monetary claim too late in that plaintiff did not raise the claim in its filings under Appendix G of this court's rules.[12] Moreover, even if it had been timely presented, plaintiff simply did not prove at trial that it had in fact "lost" the geothermal system. Plaintiff apparently remains the record owner of the pertinent permits and leases[13] and continues to pay insurance and other costs related to maintaining the wells. Defendant did not show that the government took any legal action since the contracting officer's decision to obtain possession and control over the assets. Defendant has neither brought suit to compel plaintiff to transfer title nor asserted herein a counterclaim seeking title or damages for plaintiff's refusal to transfer title. Thus, while the contracting officer has asserted that the government owns title to the assets, the government has done no more to assert control over the system. While plaintiff seeks $1,300,000 because it has "lost" the system, the evidence does not support a conclusion that plaintiff actually has lost the property in dispute. Thus, the court must deny plaintiff's claim for $1,300,000.[14]

Since this court lacks authority to grant a purely declaratory judgment as to ownership of the assets and since plaintiff failed to present timely the title issue or to establish any damages related thereto, this court need not address the question of title to resolve the issues properly before the court.

### Conclusion

For the reasons set forth above, the LOF clause of the contract controls and creates

a $935,300 ceiling on the total payments due plaintiff under the contract. The court denies plaintiff's claim for $1,300,000 relating to its alleged title to the wells and related licenses and permits. The court will not further address the title issue. The court will discuss the amount of incurred and allowable costs in a separate order.

IT IS SO ORDERED.

---

12. *See* discussion under Section III, *supra.* The court permitted testimony at trial on the issue of damages for loss of the system but expressly reserved the right to exclude this evidence.

13. Plaintiff testified that the State of Nevada treats plaintiff as the owner of the wells.

14. Plaintiff did not argue that defendant's mere assertion of right to title caused any specific damages other than a complete and permanent loss of the geothermal system.