Joseph H. ROBERTS

v.

The UNITED STATES, GREAT AMERICAN INSURANCE COMPANY, Third-Party Defendant.

No. 17–61.

United States Court of Claims.
March 18, 1966.

11. Up to the end of June 1959 the annual rental fee for a locker was $20.00 rather than $24.00.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, and COLLINS, Judges.

COWEN, Chief Judge.[1]

The plaintiff seeks recovery on a *quantum meruit* basis (measured by his total costs, less payments) for the reasonable value of a concrete roadway constructed by him for the Smithsonian Institution at the National Air Museum Storage Area, Silver Hill, Maryland. The plaintiff contends that the defendant breached his contract by furnishing misleading drawings and by overzealous supervision amounting to interference on the part of the defendant's construction representative on the job. The defendant counterclaims for delay in completion, costs expended in determining whether the road met specifications, savings realized by the plaintiff because of changes, and costs for replacing the road because of its failure to comply with specifications.

The contract was for the concrete paving of about 735 linear feet of gravel road, plus the construction of concrete culverts and ramps at the named facility. It was to have been started April 15, 1959 and completed August 13, 1959, but was not actually started until May 21 and finished January 12, 1960, some 153 days late.

The plaintiff's costs exceeded his $31,720 contract price by at least $13,531, and without doubt much more which he claimed but failed to prove. For the most part, plaintiff's losses were occasioned by errors in bidding, which produced an unrealistically low bid, and by neglect and mistakes in his performance of the contract.

◼ The plaintiff's representative made a cursory inspection of the site prior to preparing a bid, examined the single contract drawing, and failed to notice (as a careful inspection would have revealed) that a quantity of fill

Edward Gallagher, Washington, D. C., for plaintiff.

Robert R. Donlan, Kensington, Md., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

1. Although our results differ in some respects, the court acknowledges the assistance it has derived from the opinion and findings of fact of Commissioner C. Murray Bernhardt. We have borrowed much of his opinion and adopted most of his findings of fact.

would be required in order to grade the existing gravel road to required elevations. He blames the defendant's drawing for this oversight. In actuality the drawing was adequate for its purposes, although it did not give detailed elevations of the existing gravel roadway so that bidders could compute without ground measurements the quantities of fill required. The omitted elevation data were available from the contracting officer if asked for, but the plaintiff made no request. Having made no complaint during contract performance of this alleged omission in the drawing, the plaintiff's complaint arrives too late at this juncture, for he had the opportunity to avoid error in the bidding period but failed to take reasonable precautions.

The plaintiff also underestimated the quantity and composition of concrete required by $11,341.26, including a labor cost of $3,318.56. He based his bid on a four-bag mix (four bags per cubic yard of concrete), while a 5.2-bag mix was required in order to obtain the strength requirement specified in the contract. The contract did not specifically call for a 5.2-bag mix in those terms, but resort to a standard engineering manual would have readily disclosed to an experienced contractor that such a mix was necessary to obtain the desired strength.

The disparity between plaintiff's bid of $31,720 and the next lowest bid of $45,888 (other bids ranged up to $87,-410) caused the contracting officer to discuss with plaintiff the possible inaccuracy of his bid, but on plaintiff's assurance that no error had occurred the contract was awarded to him on March 30, 1959. The plaintiff says that he had anticipated large economies through using an efficient concrete paver, but was prevented from so doing by the defendant's actions. Not only is the plaintiff's evidence inconclusive that he actually intended to acquire such a device for use, but also he never complained during contract performance of frustrated intentions to use a concrete paver and there is reason to believe that the nature of the job would not have permitted such a method of paving.

Throughout performance, plaintiff consistently made technical errors in interpreting the directions of the contract drawings. Frequently, in setting stakes and placing forms for the pouring of concrete sections, he deviated from the specified elevations and was required to make corrections by defendant's construction representative. On several occasions the grading elevations were changed at plaintiff's request to spare him the cost of fill to bring certain sections of the road up to grade. The changing of elevations in one part of the road produced a chain reaction requiring grade alterations in contiguous sections so that the greater part of the road was built at elevations departing from the contract drawing.

Mr. Alden L. Howard, defendant's construction representative, served in the dual role of resident engineer and chief inspector for defendant (see finding 31). On his initiative and because he felt it necessary to insure plaintiff's compliance with the plans and specifications, defendant's representative gave specific and detailed orders to plaintiff's personnel and exercised complete control and domination over all parts of the contract performance. Such action led to considerable friction with plaintiff, because it required plaintiff to re-do much of the work and, consequently, increased the cost and delayed the completion of the project. Mr. Howard was greatly concerned that the completed road have adequate drainage. On many occasions after he had furnished plaintiff with specified elevations and plaintiff's workmen had spent most of a day in erecting forms for pouring the concrete, Mr. Howard ordered the workmen to lower, raise, or otherwise change concrete forms as designated by him. Thus, it became necessary for plaintiff to relocate the whole set of forms from the subgrade to the top finish. In some instances, Mr. Howard used a level or other instrument to ascertain whether the forms were at the proper contract eleva-

tion but, in other cases, he relied on his judgment and vision in directing the positioning of the forms.

■ In the final claim he submitted to the contracting officer, plaintiff requested compensation in the sum of $6,-622.84 for extra labor and other costs alleged to have been incurred as a result of improper directives issued by defendant's representative. In his second amended petition, plaintiff alleges that the costs of doing the work and the time required for completion of the project were increased because of defendant's unwarranted interference with plaintiff's performance.

We have determined that defendant's domination and control of the work was a breach of the contract.[2] However, we have found that most of the losses claimed by plaintiff resulted from his errors in bidding and his inefficient performance. Plaintiff is not entitled to recover for defendant's unwarranted interference with plaintiff's performance, because of plaintiff's failure to produce satisfactory proof that will enable us to determine, with reasonable accuracy, the extent of the claimed losses and delays that were due to defendant's breach of the contract. Wunderlich Contracting Company v. United States, 351 F.2d 956, 173 Ct.Cl. —— (1965) and cases cited therein.

Others errors occurred. The plaintiff misplaced a culvert, misinterpreted the locations of culverts and ditches although the contract drawing was not, as claimed, obscure as to this, excavated an access road and made it impassable in violation of the contract and was required to replace the excavation at considerable cost to him, placed excessive fill in certain locations at unneeded cost, and frequently neglected proper supervision of his workmen, all of which contributed to the cost of the job and delay in its performance.

A month prior to completion of the contract the plaintiff filed a claim for changes in the amount of $23,573.77 with the Chief of the Supply Division of the Smithsonian Institution, who may be regarded as the contracting officer in the case, although the contract was actually signed by the Secretary, the head of the Smithsonian Institution. The claim was allowed in the amount of $1,136.99, and the plaintiff invoked his rights under the standard disputes clause of the contract by appealing and demanding a hearing before a "Board of Competent People". The Secretary of the agency acknowledged the appeal by advising plaintiff that he had appointed a special board of review to "hear your case and make appropriate recommendations to me for equitable settlement", naming three persons to compose the board, including two of his subordinate officials.

The board of review thus appointed conducted a hearing attended by both sides to the controversy and entertained testimony and documentary evidence. The absence of a transcript of testimony suggests that none was made. On April 19, 1960, the board rendered its report. The agency refused to furnish the plaintiff a copy of the report until proceedings were initiated in this court because it was considered to be "an administrative communication addressed to the Secretary pursuant to the board's appointment to hear the case and make recommendations to the Secretary for equitable settlement", and thus not appropriate to be made available to the claimant.

The board's report considered the plaintiff's claim in considerable detail and recommended that, subject to informal discussions with the General Accounting Office to verify legal support for the conclusions, the plaintiff be reimbursed his net direct costs less a small charge for his underestimation of concrete requirements, all of which was subject to further auditing to establish such net direct costs. From the contents of the report it is clear that the board considered evidence which has not been presented to the court, including some which it procured on its own initiative in an informal manner. It cannot be ascer-

---

2. See discussion under Defendant's First Counterclaim.

tained just what evidence the board considered that was not available to the court, or *vice versa*. It is also clear, however, that a vital body of evidence adduced to the court but not to the board related to major defects in the completed road, for despite the board's conclusion that "[w]e understand that there is no complaint on SI [Smithsonian Institution] side as to the achieved result", pretrial investigations conducted by the defendant in preparation for trial in this court disclosed serious defects to be described in discussing the defendant's counterclaim.

On July 8, 1960, the Secretary of the Smithsonian Institution advised plaintiff that his claim was approved in the amount of $1,136.99 which, together with $1,586 admittedly due as a contract balance, was to be submitted to the agency in voucher form for payment. Instead, the plaintiff filed his petition in this court.

■ The administrative proceeding leaves much to be desired. However laudable was the effort to entertain the plaintiff's claim and to arrive at a just result, the procedure followed was so deficient technically that the Wunderlich Act (68 Stat. 81, 41 U.S.C. §§ 321, 322) is not applicable. Thus, if the Secretary of the Smithsonian Institution should be considered as the contracting officer because he signed the contract for the agency, it would be improper for him to wear a second hat as head of the department under the disputes clause, for no man can review his own decision with the requisite degree of quasi-judicial detachment and impartiality. Further, before a hearing record compiled by the designee of the head of a contract agency can be properly reviewed by a court for testing against the statutory standards, its metes and bounds must be identifiable and available to the reviewing tribunal. Where, as here, no transcript of the agency proceedings was taken and no way is apparent to ascertain the precise corpus of evidence, documentary or otherwise, which led the board to its conclusion, the reviewing court is power-

less to measure the soundness of the decision against an unknown quantum of facts. Again, if the head of an agency designates a board as his alter ego to decide factual disputes in contract claims under the disputes clause, the result of the board's deliberations must be made fully available to the claimant in the form of its decision and not refused the claimant as it was. Finally, it is clear that the Secretary did not empower the board to decide the issues raised in plaintiff's appeal. The Secretary was merely asking for the board's advice, leaving himself free to make the final decision. We are thus left with the contracting officer's decision which was affirmed by the head of the department in an order which does not show what the Secretary considered in making his determination. Under all these circumstances, we hold that the trial commissioner properly admitted de novo evidence in the trial of this action.

■ In his claim for damages, plaintiff employed a total cost basis, styled as *quantum meruit*. He has listed costs of $75,984.34, added $11,397.65 for overhead at the rate of 15 percent and $8,738.20 for profit at 10 percent, and deducted $30,134 for payments made under the contract, producing a net claim figure of $65,986.19. The defendant's audit of the itemized costs verified only $45,251.83 of them, and rejected a remaining $30,732.51 as not sufficiently shown in the plaintiff's records. The largest item in the amounts excluded is $22,280 for the use value of company-owned equipment. As to this the plaintiff neglected to comply with pretrial instructions relative to production of supporting data for pretrial verification, and when the material was offered at trial it was admitted only as an offer of proof, too late for consideration. Other parts of the total $30,732.51 in rejected cost claims were not proven at trial either because their appearance on plaintiff's damage schedule does not by itself amount to probative evidence in the absence of anything else, or because suppliers' discounts earned by plaintiff are not allowable

as costs of performance, or because an allocation of home office overhead to the contract in suit is of no probative value if no basis for the allocation is shown. Even so, proof that the plaintiff's costs thus diminished exceeded his payments under the contract would not in the usual case give rise to his right to recover the difference.

Having concluded that plaintiff is not entitled to recover except for the balance of $2,722.99 admittedly due on the contract, we shall now consider three counterclaims which have been asserted by defendant against plaintiff and the third-party defendant, Great American Insurance Company, which was the surety on plaintiff's performance bond to the extent of $15,860.

### FIRST COUNTERCLAIM—EXTRA SALARY PAID TO DEFENDANT'S CONSTRUCTION REPRESENTATIVE

 The parties stipulated that from the original contract completion date of July 28, 1959, to its actual completion on January 12, 1960, defendant paid its construction representative, Mr. Howard, the sum of $3,454.66 for 766 hours spent on the job. Plaintiff denies liability for any portion of the salary, but defendant claims the right to recover that amount by virtue of the provisions of the Termination for Default article of the contract which read in part as follows:

> If the Government does not terminate the right of the Contractor to proceed, as provided in paragraph (a) hereof, the Contractor shall continue the work, in which event he and his sureties shall be liable to the Government, in the amount set forth in the specifications or accompanying papers, for fixed, agreed, and liquidated damages for each calendar day of delay until the work is completed or accepted, or if liquidated damages are not so fixed, any actual damages occasioned by such delay. (Para. 5(b) of the General Provisions of Plaintiff's Contract.)

Since no liquidated damages were specified, the above-quoted article gave defendant the option to terminate plaintiff's contract for failure to complete it within the time provided, or to permit him to continue the work and hold him and his surety liable for any actual damages occasioned by the contractor's delay. But there is nothing in the language of the contract which authorized defendant's representative to supervise the work to the extent of exercising complete control and domination over the performance of the contract. Despite his conviction as to the necessity therefor, such acts by defendant's representative constituted a breach of defendant's implied obligation not to hinder plaintiff in the discharge of his obligations nor to increase his cost of performance. The rule is well expressed in the concurring opinion of Judge Jones in Bateson-Stolte, Inc. v. United States, 172 F.Supp. 454, 458, 145 Ct.Cl. 387, 394 (1959):

> It has been held for generations that a party to a contract may not interfere with performance by the party to be charged and still enforce the letter of the contract.

See also Anvil Mining Company v. Humble, 153 U.S. 540, 14 S.Ct. 876, 38 L.Ed. 814 (1894) and Metropolitan Paving Co. v. United States, 325 F.2d 241, 163 Ct.Cl. 420 (1963).

In apparent recognition of the facts regarding its excessive supervision, the defendant made no complaint to plaintiff about the delay in the completion of the contract. It was accepted as complete without any notice or mention that defendant would claim damages for delay.

Since it breached the contract by interfering with the contractor's performance and delaying completion to an extent not shown by the evidence, defendant is precluded from recovering anything on its first counterclaim.

### SECOND COUNTERCLAIM — SAVINGS REALIZED BY PLAINTIFF THROUGH CHANGES IN THE CONTRACT

Changes to the contract were effected with much informality and without com-

plying with those provisions of the Changes article, which state that when changes cause an increase or decrease in the amount due under the contract or the time required for its performance, an equitable adjustment shall be made and the contract modified in writing accordingly. The standard change order form was not employed. Documentary authorization for the changes consisted of a simple purchase order which, in some cases, resulted from an oral agreement between the contractor and the defendant's representative and, in others, resulted from an acceptance of plaintiff's proposals.

It was not until after this suit was instituted that plaintiff learned that defendant claimed the right to recover the savings realized by plaintiff through changes in the contract. Five minor changes were made at defendant's request, one of which saved plaintiff $280. Seven changes were made at plaintiff's request (finding 26). Collectively, all of the changes netted plaintiff a savings of $3,982 and at least 142 hours of labor. In addition, the defendant issued purchase orders for three small additions to the contract and tendered plaintiff $1,136.99 for five of eight changes claimed by plaintiff in a larger amount (finding 29).

There can be no question that the savings realized by the contractor through the changes mentioned above were well known to the defendant by the time the contract was completed and long before the final administrative decision was rendered. Defendant's evidence as to the amount of the contractor's savings consisted entirely of the expert testimony of defendant's construction representative, who made his computations from data that were available to him at the time the contract was performed. It was upon his recommendation that the contracting officer issued the purchase orders which authorized changes in the contract. It has many times been held that the purpose of the requirement that the contractor's claim for adjustment under the changes article be asserted in writing within 30 days from the date the notice of the change is received is to give the Government an opportunity to examine the supporting evidence while the claim is still fresh. When the contractor fails to submit a written claim within the time limit or to appeal from an adverse decision of the contracting officer, the contractor's claim for increased costs is generally barred. Irwin & Leighton v. United States, 104 Ct.Cl. 84 (1945). The language of the Changes article provides that when a change causes a decrease in the amount due on the contract, "an equitable adjustment *shall* be made." We think that this provision imposes upon the contracting officer the duty to make such an adjustment within a reasonable time, so as to afford the contractor an opportunity to appeal from an unreasonable or arbitrary decision while the facts supporting the claim are readily available and before the contractor's position is prejudiced by final settlement with his subcontractors, suppliers, and other creditors. It is undisputed that the final decision by the head of the department in this case was rendered on July 8, 1962, without prior advice or suggestion to plaintiff that the savings would be deducted from the amount due under the contract or charged against him. By the Government's acquiescence and silence, plaintiff was led to believe that no claim would be asserted for the savings. Under these circumstances we hold that the failure of the contracting officer to make an equitable adjustment, within a reasonable time after it was apparent that savings had been realized and in time for the contractor to appeal any dispute on the matter to the head of the department, constituted a waiver by the Government of any entitlement to the claimed savings. As this court stated in Branch Banking and Trust Company v. United States, 98 F.Supp. 757; 120 Ct.Cl. 72, 88 (1951), cert. denied 342 U.S. 893, 72 S. Ct. 200, 96 L.Ed. 669, when the Government is acting in its proprietary capacity, it may be estopped by an act of waiver in the same manner as a private

contractor. Such a result is justified by the plain language of the contract and accords with the principles of fair dealing.

Although the defendant contends otherwise, we have found no court decision which, after considering a similar factual situation, stands for a contrary proposition.

In Appeal of Randall Construction Co., WDBCA 675, 2 CCF 1117 (1944), the Board of Contract Appeals held that the contracting officer's delay of more than one year after the work was completed before issuing a modification reducing the contract price, was unreasonable, particularly since it appeared that the contractor had settled with his subcontractors and the delay had induced the belief that no price adjustment was contemplated.

In Topkis Brothers Company v. United States, 297 F.2d 536, 155 Ct.Cl. 648 (1961), upon which defendant relies, defendant was permitted at the trial, without objection by plaintiff, to amend its answer by asserting a claim for savings realized through a deviation in the contract specifications, although the contracting officer had not issued a modification to the contract. Upon the basis of plaintiff's failure to object and without discussing the legal question presented here, the court allowed the counterclaim. Here the plaintiff has from the beginning objected strenuously to the counterclaim on the ground that it was asserted too late.

Salem Products Corp. v. United States, 298 F.2d 808 (2d Cir.1962), which defendant also cites, illustrates the proper procedure which should be followed by the Government in establishing a claim for savings realized by the contractor through changes made in the contract. There the contracting officer issued a change order which permitted the contractor to use an alternative method of performance, provided the change could be accomplished at no additional cost to the Government. Thereafter, a review of the completed work revealed that the contractor had realized a savings as a result of the deviation, and the contracting officer issued a change order adjusting the price downward in ample time for the plaintiff to appeal the resulting dispute to the Armed Services Board of Contract Appeals. The absence of such timely action by the Government in this case clearly distinguishes it from the holding in *Salem Products*.

Defendant is not entitled to recover on its second counterclaim.

THIRD COUNTERCLAIM — FEES PAID TO INSPECTION ENGINEERS

 In preparation for trial, the defendant paid $2,250 to a firm of inspection engineers to make core borings in each section of the concrete roadway in suit and to test two of the cores taken. The results of the core borings, described in findings 19 and 20, revealed that the roadway failed to comply with specifications as to wire reinforcement and thickness of the concrete. These deficiencies were not capable of detection after the pouring of the concrete, because they were within the concrete itself and were thus hidden defects that were not readily observable on visual examination. Nor was the Smithsonian Institution's board of review aware of this condition at the time it issued its report alluded to earlier. Paragraph 9(c) of the General Provisions of the contract provides in pertinent part as follows:

Should it be considered necessary or advisable by the Government at any time *before final acceptance* of the entire work to make an examination of work already completed, by removing or tearing out same, the Contractor shall on request promptly furnish all necessary facilities, labor, and material. If such work is found to be defective or nonconforming in any material respect, due to fault of the Contractor or his subcontractors, he shall defray all the expenses of such examination and of satisfactory reconstruction. * * * [Emphasis supplied.]

Here the cost of the Government inspection was incurred subsequent to final acceptance of the contract as complete. By the plain terms of the contract, drafted by the Government and, therefore, to be construed against it, the inspection costs in question cannot be recaptured by the Government because they were not incurred before final acceptance. This part of defendant's third counterclaim must be disallowed.

## THIRD COUNTERCLAIM—EXPENSE OF REMOVING AND RECONSTRUCTING THE ROADWAY

In this part of its third counterclaim, defendant seeks to recover $53,773.50 for the cost of removing and reconstructing the entire roadway or $8,962.20 (representing one-sixth of the cost of removing and reconstructing the entire road) for the replacement of 20 sections that are cracking and spalling because of improperly formed expansion joints covered by false expansion joints. The defects present in the roadway fall into three categories:

(1) Those which were visible at the time the contract was completed and accepted;

(2) those whose existence which could only be detected by the passing of time or by means of core borings, and

(3) those caused by defendant's faulty design.

The road was visibly rough and out of alignment in many sections, a readily observable condition and therefore a patent defect for which the Government is not entitled to recover, since it accepted final performance embracing such perceptible flaws. Over a considerable portion of the roadway a longitudinal crack meanders down the center of the road; this damage was caused by defendant's errors in designing the road.

Latently defective were those sections of the roadway in which plaintiff failed to install the required amount of wire mesh, sections in which the thickness of the concrete fell below the tolerance acceptable under the specifications, and sections in which the expansion joints between the road sections were improperly constructed and covered with a "dummy" joint. For these shortcomings, the Government claims payment under Paragraph 9(d) of the General Provisions of the contract, reading as follows:

Inspection of material and finished articles to be incorporated in the work at the site shall be made at the place of production, manufacture, or shipment, whenever the quantity justifies it, unless otherwise stated in the specifications; and such inspection and written or other formal acceptance, unless otherwise stated in the specifications, shall be final, *except as regards latent defects*, departures from specific requirements of the contract, damage or loss in transit, fraud, or such gross mistakes as amount to fraud. * * * Nothing contained in this paragraph (d) shall in any way restrict the Government's rights under any warranty or guarantee. [Emphasis supplied.]

Plaintiff argues that the term "latent defects" applies to finished articles and materials delivered under supply contracts rather than to work performed under construction contracts. The fact that the term has arisen infrequently in a construction contract context does not affect the vitality of the above-quoted provision. It is well settled that such a covenant avoids the preclusive effect of final acceptance when latent defects are involved. Bar Ray Products, Inc. v. United States, 162 Ct.Cl. 836 (1963) and same case, 340 F. 2d 343, 167 Ct.Cl. 139 (1964); United States v. Hamden Co-Operative Creamery Co., 297 F.2d 130 (2d Cir.1961), affirming 185 F.Supp. 541 (E.D.N.Y. 1960).

McQuagge v. United States, 197 F. Supp. 460 (W.D.La.1961), upon which plaintiff relies, is not in point. In that case, the court specifically stated that it

"was not dealing here with latent defects, fraud or misrepresentations."

 It does not follow, however, that defendant prevails on the counterclaim. On the contrary, other circumstances militate against such a conclusion. In actions brought upon contracts in this court, we have stated that plaintiff must shoulder the burden of "establishing the fundamental facts of liability, causation, and resultant injury" relating to the claim for which he seeks recovery. Wunderlich Contracting Co. v. United States, supra. That requirement applies with equal efficacy to counterclaims brought by the Government. Cf., J. D. Hedin Construction Co. v. United States, 347 F.2d 235, 171 Ct.Cl. —— (1965); Litchfield Manufacturing Corp. v. United States, 338 F.2d 94, 97, 167 Ct.Cl. 604 (1964). The record shows that the roadway had collective imperfections that fall within the three categories which we have described above. All that the Government has attempted to prove is that it would cost $53,773.50 to replace the entire roadway, or $8,962.-20 to replace 20 sections or one-sixth thereof. There is no way to approximate the amount of the claimed replacement costs that are due to plaintiff's failure to observe the contract provisions separately from replacement costs that are required because of patent defects and defendant's faulty design. The rule announced in the cases cited above is particularly applicable in situations where, as here, the damages claimed are due in unproven part to factors for which the party against whom recovery is sought is not responsible. Commerce International Co., Inc. v. United States, 338 F.2d 81, 167 Ct.Cl. 529 (1965). Since defendant's evidence does not provide any basis for making a reasonably accurate determination of the amount that defendant has been damaged as a result of latent defects in the roadway that are attributable to plaintiff's failure to comply with the contract, defendant is not entitled to recover on this portion of its third counterclaim.

## CONCLUSION

Plaintiff is entitled to recover the sum of $2,722.99, the balance admittedly due on the contract. Defendant is not entitled to recover on its counterclaims and they are hereby dismissed.