**HYDROTHERMAL ENERGY CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 116–87C.**

United States Claims Court.

Aug. 17, 1992.*

---

* This order originally was not issued for publication. However, the court has concluded that publication is appropriate. Therefore, this or-

der is reissued as of October 29, 1992, and is available for publication.

Fadlo Mousalam, Santa Cruz, Cal., for plaintiff.

Steven L. Schooner, with whom were Asst. Atty. Gen. Stuart M. Gerson, David M. Cohen, Director, and Mary Mitchelson, Deputy Director, Washington, D.C., for defendant. Harvey S. Brosler, Jacob D. Vreeland, and Matt Urie, U.S. Dept. of Energy, of counsel.

## ORDER

ANDEWELT, Judge.

In this government contract action, plaintiff, Hydrothermal Energy Corp. (HEC), entered a contract with the United States Department of Energy (DOE) to develop a geothermal heating system in Reno, Nevada. DOE subsequently terminated the contract for the convenience of the government. In an April 17, 1992, opinion, this court denied plaintiff's claim for $1,300,000 relating to its alleged title to the wells and related licenses and permits, and concluded that the contract's Limitation of Funds clause created a $935,300 ceiling on the total due plaintiff under the contract. *Hydrothermal Energy Corp. v. United States*, 26 Cl.Ct. 7 (1992) (*HEC I.*). Plaintiff has received $924,693 in payments under the contract and now seeks an additional payment of all reimbursable or "allowable" costs under the contract, including costs related to defendant's termination for convenience.[1] Defendant contends that it

---

1. Contrary to defendant's assertion in its supplemental brief, *HEC I* did not deny plaintiff's claim for termination costs. *HEC I* set a cap on the total payments to plaintiff under the contract at $935,300. Plaintiff may receive reimbursement for all termination costs otherwise allowable under the contract so long as the total amount received by plaintiff, including payments for contract performance, does not exceed that cap. Contrary to plaintiff's assertion in its filing of July 6, 1992, *HEC I* determined that the cap applies to post-termination costs. Plaintiff's entitlement to funds incurred after termination derives solely from the contract and, thus, is "under" the contract as the court used that term. *Id.* at 10, 17.

has overpaid plaintiff and has filed a counterclaim for a refund of most of the $924,-693 it has already paid. The sole issue remaining before the court is the total amount of plaintiff's allowable costs under the contract. For the reasons set forth below, the court concludes that plaintiff's total allowable costs are less than the payments plaintiff has already received. Accordingly, plaintiff's complaint shall be dismissed and defendant's counterclaim is granted in part.

### A.

The facts and claims in this contract action are set forth in detail in *HEC I* and will not be repeated here. The court notes that its task of determining the total amount of allowable costs has been greatly complicated by the litigation strategies adopted by the parties. At trial, each party presented a witness who had examined plaintiff's records, and each party asked the court to rely heavily upon its witness' conclusions. Defendant's witness was an experienced government CPA auditor who detailed alleged serious problems that he confronted when auditing plaintiff's records. The auditor repeatedly asked plaintiff for additional information to support plaintiff's claims. When the additional information supplied was found adequate, the auditor made appropriate adjustments in plaintiff's favor but, ultimately, concluded that the information submitted was inadequate to support large amounts of plaintiff's monetary claims.[2] In turn, plaintiff relied upon an expert in government contract accounting (not a CPA) who testified that plaintiff's records were typical for a small business with government contracts and, therefore, under generally accepted accounting principles, should have been deemed sufficient to support all of plaintiff's claims.

But, while each party asked the court to rely heavily upon the conclusions of its witness, neither party provided the court with a complete set of materials on which

its witness had based his conclusions. For example, the government auditor had reviewed plaintiff's check registers and other documentation in evaluating the claims but these materials were not presented into evidence in their entirety. In addition, neither party permitted the court to assess allowable costs by studying the work actually performed under the contract since neither party presented detailed evidence supporting the reasonableness, or unreasonableness, of the cost of such work. In this setting, the court is not in a position to review for itself the entire basis of certain of the respective witnesses' conclusions as to allowable costs.

As explained below, this seemingly high-risk strategy utilized by the parties has prevented this court from immersing itself into the facts of the case and coming to its own determination as to allowability of certain costs. *See, e.g., WRB Corp. v. United States,* 183 Ct.Cl. 409, 426 (1968). It has also prevented the court in certain areas from relying with full confidence on the testimony of either plaintiff's expert or defendant's CPA auditor. Apparently because of this incompleteness of the record, each party seeks to prevail based on broad principles. But, ultimately, neither party is successful.

### B.

Defendant relies upon *Roberts v. United States,* 174 Ct.Cl. 940, 949, 357 F.2d 938, 944-45 (1966), and *Malissa Co. v. United States,* 18 Cl.Ct. 672, 674-75 (1989), two cases in which a government contractor's claims were denied because the contractor had failed to present sufficient evidence. In *Roberts,* the court stressed that the "appearance [of a cost claim] on plaintiff's damage schedule does not by itself amount to probative evidence in the absence of anything else." 174 Ct.Cl. at 949, 357 F.2d at 944. In *Malissa,* the court concluded that plaintiff's "confusing" presentation of evidence and "hodge-podge" of

---

**2.** The auditor prepared two audits—one of the costs billed, and the other of plaintiff's termination and settlement claim. The audit of billed costs was revised several times, as will be discussed below; the audit of termination costs was in large part ignored by the parties and was not a focus of their trial presentations.

witnesses made it impossible to find a reasonable basis for an award to plaintiff. 18 Cl.Ct. at 675. Herein, defendant asserts that plaintiff's entire claim must be rejected, and defendant's counterclaim granted, because plaintiff's evidence is as deficient as the evidence presented in *Roberts* and *Malissa.*

But, while the evidence plaintiff presented at trial is clearly insufficient to support some claims, it is adequate to support other claims. Plaintiff did not rely merely upon the listing of the costs in its damage claim. Plaintiff provided copies of documents that it had submitted to the government auditor in response to the auditor's requests for supplemental information, and plaintiff presented testimony not only from its expert in government contract accounting, as noted above, but also from fact witnesses, including plaintiff's president, Dr. David J. Atkinson, who took charge of the contract for plaintiff, and Mr. Kenneth R. Zahora, DOE's representative who monitored plaintiff's contract performance. In addition, unlike the witnesses in *Malissa,* plaintiff's witnesses were able to explain adequately the meaning of certain documents upon which plaintiff relied.[3]

■ Plaintiff seeks to prevail on the broad premise that its expert in government contract accounting testified that

plaintiff's records were typical of a small business and thus should have been accepted as supportive of all of plaintiff's claims. But this testimony was contradicted by the government auditor, who testified to the effect that plaintiff's documentary support for its claims was clearly deficient when compared to typical small business government contractors,[4] and was so terribly deficient in some areas that even a reasonable person could not come up with a reasonable estimate of allowable costs.[5] Because plaintiff's expert testimony was disputed by the government auditor, the court will not allow any of plaintiff's claims based exclusively on its expert's conclusion that plaintiff's record keeping was adequate.

In this context, without any broad principle on which to resolve plaintiff's claims on an "all or nothing" basis, this court must evaluate the evidence that has been presented and come to a determination for itself whether the costs in dispute are allowable. In an attempt to redirect the parties' focus from the "all or nothing" strategy upon which each had primarily relied in its post-trial brief, the court requested supplemental briefs in which the parties were asked to isolate the contract and regulation terms that control the determination of reimbursable or allowable costs, and then, for each area of costs, to evaluate the

3. Material presented included numerous cancelled checks, invoices, monthly cost summaries and monthly reports to DOE, copies of contracts and subcontracts, water use permits, and other secondary materials such as affidavits. However, plaintiff did not efficiently organize these documents. For example, documentation for certain vendors' costs was often spread across several different volumes without an index, which necessitated laborious cross-checking by the court. In addition, plaintiff did not consistently employ the same time periods in reporting, substantiating, and analyzing direct labor costs. However, despite such inefficiencies on plaintiff's part, the court has been able to work with the materials to the extent described below.

4. The government auditor testified that he had audited three companies, each consisting of less than five employees, in the past three or four years, and that all three companies had "adequate accounting systems."

5. Plaintiff emphasizes the government auditor's testimony that a person "like" plaintiff's expert

could perform the calculations and reach the conclusions plaintiff's expert reached based on plaintiff's records even though the auditor himself could not or would not make those calculations or reach those conclusions. But this testimony proved no more than the obvious—persons can perform such calculations and reach such conclusions. It says nothing about whether it would be proper in this case to make such calculations or reach such conclusions on the basis of the evidence presented. Plaintiff also asserts that defendant was attempting to hold plaintiff to the stricter record keeping requirements promulgated by the Cost Accounting Standards Board (CASB), *see, e.g.,* 41 C.F.R. § 1–3.1220 (1979). Except for definitional sections incorporated into the contract, these standards did not apply to plaintiff as a small business. However, defendant has merely asserted that plaintiff's records fail to meet generally accepted accounting principles and that in some respects the CASB standards are identical to these principles.

evidence in the record and present an argument as to why that evidence is or is not sufficient to support a finding of allowability.

## C.

The contract incorporated by reference portions of the Federal Procurement Regulations, 41 C.F.R. § 1–15.2, as in effect on the date of the contract, as the standard for determining whether plaintiff's claimed costs can be reimbursed.[6] Section 1–15.-201–1 provides, in pertinent part:

> The total cost of contract is the sum of the allowable direct and indirect costs allocable to the contract, incurred or to be incurred, less any allocable credits. In ascertaining what constitutes costs, any generally accepted method of determining or estimating costs that is equitable under the circumstances may be used....

Section 1–15.201–2 provides that the "[f]actors to be considered" in determining whether costs are reimbursable include whether the costs are reasonable, allocable to the contract, documented according to generally accepted accounting principles, and in accord with any other "limitations or exclusions set forth in this Subpart 1–15.2 or otherwise included in the contract as to types or amounts of cost items." Section 1–15.201–3 provides that "[a] cost is reasonable if, in its nature or amount, it does not exceed that which would be incurred by an ordinarily prudent person in the conduct of competitive business." Other "limitations or exclusions" applicable will be discussed below as appropriate.

## D.

*Direct Labor Costs Incurred Prior to Termination*

Plaintiff billed $201,329 for direct labor costs it incurred prior to the issuance of Modification M009 (the stop-work order)

and asserts that it incurred another $17,587 in the interval between the stop-work order on May 11, 1983, and the termination for convenience on October 11, 1983 (the stop-work period). Plaintiff attributes the majority of these costs to work performed by its president, Dr. Atkinson, and the remainder to work performed by other HEC staff. Plaintiff calculated this direct labor at an hourly rate and billed defendant monthly.

Dr. Atkinson was the "principal geologist" in charge of selecting well sites and the person who, with the assistance of consultants, obtained water and land use permits and leases, negotiated contracts for use of geothermal energy, selected drillers and suppliers, and in general performed all managerial duties on the project. At all relevant times, plaintiff was a very small company. Aside from an administrative assistant/secretary, it does not appear that plaintiff had any other permanent, full-time employees other than Dr. Atkinson. At its largest, plaintiff consisted of only about five employees. Plaintiff was incorporated approximately one year before obtaining the contract in issue, and its total annual budget never exceeded $400,000 during the life of the contract.

Defendant acknowledges that plaintiff spent significant funds for direct labor on the project. Plaintiff negotiated contracts, secured permits, conducted meetings, purchased equipment, and drilled wells. But while it acknowledged that the contract anticipated the payment of direct labor costs, defendant asserts that plaintiff is not entitled to recover any of these costs because plaintiff failed to maintain adequate documentation to show that it incurred these costs in executing the contract.

As to required documentation, the "Audit" clause of the contract required that plaintiff maintain records "sufficient to reflect properly all direct and indirect costs

---

6. The contract's original effective date was June 25, 1979, and the relevant portions of the Federal Procurement Regulations were incorporated in the contract's "General Provisions" both under the "Termination" clause and the "Allowable Cost and Payment" clause, as amended. Although the "General Provisions" were revised pursuant to Modification A006, effective July 30, 1981, the relevant regulatory provisions remained unchanged. Thus, it is unnecessary to consider whether Modification A006 changed the effective date for purposes of identifying the applicable regulations.

of whatever nature claimed to have been incurred and anticipated to be incurred." Toward this end, plaintiff did not prepare daily or weekly time sheets but did prepare monthly summaries that indicated the number of hours each employee spent on each contract task and described the work performed.[7] Based on these summaries, plaintiff submitted monthly invoices and reports to defendant which set forth a total monthly direct labor cost without any breakdown by hours, tasks, or the employees who performed the labor.

Based primarily on the testimony of the government auditor, defendant contends that plaintiff's record keeping as to costs incurred is insufficient and fails to comply with generally accepted accounting principles applicable to small businesses. Defendant complains that in documenting direct labor, plaintiff should have kept contemporaneous time sheets or time cards and not relied upon monthly summaries. In addition, defendant complains that there is no correlation between the monthly billings and the amounts of the paychecks paid to Dr. Atkinson.[8] Since it had no adequate means of verifying plaintiff's monthly summaries, defendant contends that plaintiff's direct labor claim should be denied in its entirety. Plaintiff's expert disagreed with the government auditor and testified that plaintiff's record keeping was in accordance with generally accepted accounting principles and was equivalent to the accounting systems of similar very small businesses.

In this "all or nothing" setting, the court will agree with plaintiff's expert and conclude that in insisting on time sheets, defendant has not employed a "generally accepted method of determining or estimating costs that is equitable under the circumstances." 41 C.F.R. § 1–15.201–1.[9] Dr. Atkinson was a salaried employee and was not paid on an hourly basis. Therefore, there is no reason to expect that the amount of his paychecks would in any way correspond to the monthly direct labor billings on this contract. As to documentation, the court notes that plaintiff used essentially the same accounting system throughout the contract of which the government was well aware, and defendant apparently never criticized plaintiff's system until well after the contract was terminated. In this regard, the Defense Contract Audit Agency (DCAA) performed an audit during the performance of the contract and reviewed at least some of plaintiff's files. A resulting April 23, 1981, DCAA report states:

> The evaluation was performed in accordance with generally accepted auditing standards and included such tests of the contractor's records and such other auditing procedures as were considered necessary in the circumstances. The cost principles contained in [41 C.F.R. §] 1–15.2 ... were used as criteria in the evaluation of proposed costs.

Although the DCAA pointed out a number of problems with plaintiff's proposal, the DCAA did not identify an absence of sufficient records on direct labor costs as a problem to be addressed by plaintiff. In addition, DOE's project manager, Ken Zahora, requested backup documentation to substantiate plaintiff's invoices and received six of the monthly summaries. He apparently did not object to the adequacy of this substantiation. The court has also examined these summaries, which include detailed descriptions of the labor tasks performed, and finds them credible and supportive of plaintiff's direct labor costs.

Hence, the court finds that plaintiff adequately documented its direct labor costs to show that they were incurred and were allocable to the contract. As to rea-

7. Plaintiff allegedly based these summaries on Dr. Atkinson's "notes of hours," which were never seen by the court and apparently were never seen by the government auditor or any of DOE's staff.

8. Plaintiff blames such inconsistencies on late payments by defendant, which caused cash flow problems for plaintiff and, in turn, caused plaintiff to postpone payments to Dr. Atkinson.

9. While the court does not adopt the government auditor's position in this regard, the court finds the government auditor generally a highly credible witness who worked conscientiously and diligently in a difficult situation.

sonableness, based on the limited evidence plaintiff has submitted, the court concludes that the costs were reasonable even though the project was unsuccessful. There is no specific allegation, and no proffer of evidence, that the work could or should reasonably have been done for a lower direct labor cost. The project was speculative in nature and plaintiff was asked to demonstrate the economic feasibility of an essentially untried technology, and neither plaintiff's failure to complete the geothermal heating system within budgeted costs nor plaintiff's inability to attract enough end-users to make the project financially feasible is a sufficient reason to conclude that the actual costs were unreasonable.[10]

*Direct Labor Costs Incurred After Receipt of the Notice of Termination*

The "Termination" clause of the contract and 41 C.F.R. § 1–15.205–42 place additional conditions on plaintiff's entitlement to reimbursement for costs incurred after termination. Allowable post-termination costs fall into two broad categories: (1) costs generally reimbursable when incurred during contract performance which, with reasonable effort, cannot be terminated on the date the government terminates the contract; and (2) additional costs which are incurred in terminating the contract, preparing a settlement proposal, or maintaining and protecting government property involved during the period prior to the government's assumption of control over the property.

■ At trial, plaintiff presented its post-termination direct labor costs without specifying the various tasks on which the labor was expended. However, plaintiff did assert at trial that a substantial proportion of these costs was expended in preserving and protecting the property involved, primarily

the geothermal wells, by physical barriers and by maintaining insurance and reporting to state and local regulatory agencies to maintain plaintiff's status as a utility so that the wells could one day be exploited as intended. But not all of such costs are proper post-termination costs. Under the contract's "Termination" clause, plaintiff was required to "proceed immediately ... notwithstanding any delay in determining or adjusting ... any item of reimbursable cost" to transfer title to the government of "work in process, completed work, supplies, and other material produced as a part of" the contract work, and "plans, drawings, information, and other property which, if the contract had been completed, would be required to be furnished to the Government."

On the one hand, if as defendant alleges, it owns title to the property involved, then plaintiff was obliged to turn the property over to defendant "immediately" and the costs of protecting the property for an extended period would not be allowable. In deciding to resist defendant's demand for transfer of title, plaintiff, in effect, assumed the risk of paying for the maintenance and protection of government property. The contract does not obligate defendant to underwrite plaintiff's efforts to "hold on" to property which belongs to the government.[11] On the other hand, if, as plaintiff contends, it and not the government rightfully owns the property, then plaintiff is not contractually obligated to protect it and costs of protection and maintenance are not reasonably incurred due to the termination.

■ Other post-termination direct labor costs were at least potentially recoverable under the contract, such as the costs associated with preparing the settlement pro-

10. Indeed, while plaintiff's technical and business failures justified defendant's decision to replace plaintiff, *see HEC I,* 26 Cl.Ct. at 16, the court notes that the replacement contractor chosen by defendant, Chilton Engineers, apparently also failed to produce an adequate geothermal well.

11. Indeed, 41 C.F.R. § 1–15.205–42(b) states that costs that are continued after termination due

to the "willful failure of the contractor to discontinue such costs shall be considered unallowable." Plaintiff's evidence is not sufficiently detailed to enable the court to identify that proportion of costs incurred to protect the property that would have been reasonable if plaintiff had promptly transferred the property to the government in compliance with the contract.

posal and negotiating settlements with subcontractors. However, plaintiff simply has failed to substantiate the specific costs which were incurred in pursuit of these activities.[12] Plaintiff simply lumped together all of the purported costs in this category, some of which are unallowable, and it is not possible for the court to assess the amount that is allowable. Thus, there is a failure of proof and the court will not award any costs for post-termination direct labor.

Plaintiff's total allowable direct labor cost is $218,916.

### E.

#### Billed Direct Costs

■ Plaintiff has presented substantial documentation with respect to billed direct costs. In 1985, defendant originally audited plaintiff's billed costs. In response to requests by the government auditor, plaintiff provided invoices and cancelled checks in support of these costs. In his latest revision of the 1985 audit, dated July 5, 1990, the government auditor came to the following conclusions concerning these billed costs:

| | |
|---|---|
| Total Costs Billed | $499,195.00 |
| Amount Allowable | $328,361.00 |
| Amount Unallowable | $155,492.00 |
| Amount Unsupported | $ 15,342.00 |

The government auditor also testified that at a meeting shortly before trial, he reviewed more of plaintiff's submissions and further modified his above conclusions to allow more of the costs.

Defendant, in its post-trial briefs, now contends that the court may not rely upon the July 5, 1990, modification of the 1985 audit or on the auditor's related trial testimony because each of these simply reflect an attempt by the government to settle the case. Instead, defendant now argues that the conclusions of the auditor's original 1985 audit should be used to define the government's position. But there is no evidence to indicate that in arriving at the adjustments reflected in the July 5, 1990, modification the auditor in any way relaxed his standards. To the contrary, the evidence demonstrates that the auditor made the adjustments using exactly the same standards as were applied in the original audit.[13] In any event, the court has reviewed the evidence upon which the government auditor relied to reach his July 5, 1990, conclusions, plus the additional evidence presented at trial, and the court agrees with the auditor that billed direct costs of $328,361 were properly classified as allowable.

In his July 5, 1990, audit, the auditor found $15,342 of the costs unsupported because there was a lack of proof of payment and lack of back-up documentation for the costs. At trial, the auditor acknowledged that plaintiff had supplied the back-up documentation. In reviewing the evidence, the court has found cancelled checks or other evidence sufficient to support proof of payment.[14] The $15,342 of billed costs therefore is allowable.

---

12. In an August 1990 affidavit, Dr. Atkinson stated that over a period of approximately six years, while working on the termination claim and subsequent negotiations, he had incurred $54,185 in post-termination labor. Dr. Atkinson's trial testimony indicates that during this period he also had worked on preserving the property involved and on other tasks the court has determined to be unallowable. It is not clear the extent to which these unallowable costs are part of the $54,185 claim. Moreover, $54,185 in direct labor by Dr. Atkinson is equivalent to approximately ⅔ of his $78,000 yearly salary. Plaintiff has not demonstrated that this expenditure was reasonable for the allowable work Dr. Atkinson accomplished. Indeed, it appears unreasonable. In addition, support for this claim is scant. Plaintiff has not provided time cards, monthly summaries, or any other

basis for accepting that this figure is accurate or reasonable for the work Dr. Atkinson accomplished, or that it excludes unallowable costs as described above.

13. Indeed, the contracting officer himself testified that amendments based on submissions of additional documentation changed the amount he recommended for acceptance. The fact that the auditor accepted vendor affidavits in lieu of missing invoices from those vendors was not a relaxation of the auditor's standards.

14. Most of these costs were payments to Radian Corporation, Whittelsey Associates, and the firm of Hertzberg, Koslow, and Franzen. The record evidence shows that these payments were made by plaintiff for services in addition to those already accepted by the auditor for these contractors.

As to the $155,492 in costs the auditor had classified as "unallowable," the court concludes that all but $18,793 of these costs are allowable. All of the $155,492 in costs involved payments to consultants and subcontractors. In his July 1990 audit, the auditor had disallowed plaintiff's alleged costs for settlements with subcontractors Southwest Drilling and Humboldt Drilling on the ground that there was no proof of payment. At trial, the auditor accepted the Southwest Drilling claim and plaintiff has presented evidence sufficient for the court to find that the Humboldt Drilling costs were paid and otherwise allowable.[15]

The auditor disallowed the remaining amount of "unallowable" costs for a variety of reasons, including lack of proof that the contracting officer had given approval prior to plaintiff incurring the costs. At trial, the parties disputed the issue of prior approval but, ultimately, defendant waived the requirement of contracting officer approval for consulting agreements and subcontracts. Thus, as to these costs, the crucial issue is the extent to which the costs are otherwise allowable. The court has reviewed the evidence and concludes that all of the costs are allowable except for the following: [16]

| | |
|---|---|
| F.H. Hutchison & Co. | $ 977.00[17] |
| Fred Anderson Drilling | $ 15,105.00[18] |
| Radian Corp. | $ 2,711.00[19] |
| Total Unallowed | $ 18,793.00 |
| Total Allowable Billed Costs | $480,402.00 |

*Direct Costs Incurred During the Stop–Work Period*

Plaintiff requests a total of $14,297 in direct costs for the stop-work period. These costs were never billed to defendant and it is unclear whether all of the trial evidence in support of these costs was reviewed by the government auditor. Under the contract and regulations, the court finds allowable only those costs for which plaintiff has provided both invoices and proof of payment and which were consistent with the stop-work order. The court will not allow costs for which plaintiff presented only a cancelled check because a cancelled check alone is insufficient to demonstrate that an incurred cost was allocable to the contract or reasonable for the work performed. The court allows the following costs incurred during the stop-work period:

| | |
|---|---|
| Yoram Eckstein | $ 650.00 |
| SAI Engineers | $ 222.45 |
| Allen Paving | $ 720.00 |
| Mayflower | $ 87.50 |
| Thermasource | $ 515.60 |
| Total Unallowed Costs | $12,101.45 |
| Total Allowable Direct Costs for the Stop–Work Period | $ 2,195.55 |

*Direct Costs Incurred After Termination*

Plaintiff has submitted adequate documentation and testimony to support only a limited amount of the costs it claims under this category. Except for the following listed costs, plaintiff has failed to provide a sufficient basis to meet the contractual and regulatory requirements for the court to

---

15. Plaintiff attests to a wire transfer of $7,500 to Humboldt, which it has supported by a listing of disbursements.

16. Although at trial the government auditor continued to question the allocability of the costs of subcontractor International Management Resources, this consultant's invoices stated that the work performed was for the instant contract. At trial, the auditor also accepted the costs of Water Development Corporation except for the preapproval issue.

17. In a May 19, 1988, letter, defendant agreed to accept F.H. Hutchison & Co.'s unsworn affidavit "as supported with copies of HEC checks" to substantiate this claim. Plaintiff provided six checks totaling $6,797.23. In alleging that it had provided complete documentation, plaintiff erroneously double-counted one check, #2596 for $1,000, leaving $977 unsupported.

18. The auditor asserts that plaintiff billed $33,200 for Fred Anderson Drilling (Anderson). Plaintiff has provided copies of cancelled checks and a statement from Anderson to support $18,095 in costs. Plaintiff asserts that it only billed defendant $9,935 for Anderson. However, the court need not resolve whether or not the $23,265 difference was billed to Anderson. Plaintiff does not dispute the amount of the total billing under the contract, a figure which includes the $33,200 figure. Thus, this $33,200 must have been billed to some vendor, even if not Anderson. Plaintiff has failed to support $15,105 of this billing with cancelled checks to any vendor.

19. Plaintiff admits that it erroneously "double-billed" the $2,711 to Radian Corporation.

conclude that these costs paid after termination are allowable under the contract.

| | |
|---|---|
| Humboldt Drilling | $ 2,470.00[20] |
| Franzen & Assocs. | $ 127.90 |
| Owen Bros. | $ 227.50 |
| Henderson & Nelson | $ 1,672.53 |
| Hudson, Creyke, Koehler & Tacke | $ 2,589.75 |
| Clements & Assocs. | $ 1,430.00 |
| Pettit & Martin | $10,000.00[21] |
| Total Allowable Direct Costs Incurred After Termination | $18,517.68[22] |

### F.

*Indirect Costs: Overhead and General and Administrative Costs*

■ As with direct costs, for indirect costs to be allowable, such costs must be reasonable and allocable pursuant to the "Basic considerations" set forth in 41 C.F.R. § 1–15.201. In addition, indirect costs must also meet the requirements of 41 C.F.R. § 1–15.203, which provides, in pertinent part:

(a) An indirect cost (see § 1–3.1220 for definition) is one which, because of its incurrence for common or joint objectives, is not readily subject to treatment as a direct cost.... After direct costs have been determined and charged directly to the contract or other work as appropriate, indirect costs are those remaining to be allocated to the several cost objectives. No final cost objective shall have allocated to it as an indirect cost any cost, if other costs incurred for the same purpose, in like circumstances, have been included as a direct cost of that or any other final cost objective.

(b) Indirect costs shall be accumulated by logical cost groupings with due consideration of the reasons for incurring the costs. Each grouping should be determined so as to permit distribution of the grouping on the basis of the benefits accruing to the several cost objectives....

(c) Each grouping shall be distributed to the appropriate cost objectives. This necessitates the selection of a distribution base common to all cost objectives to which the grouping is to be allocated. The base should be selected so as to permit allocation of the grouping on the basis of the benefits accruing to the several cost objectives. This principle for selection is not to be applied so rigidly as to complicate unduly the allocation where substantially the same results are achieved through less precise methods.

Pursuant to 41 C.F.R. § 1–3.1220(14), an indirect cost is "[a]ny cost not directly identified with a single final cost objective, but identified with two or more final cost objectives or with at least one intermediate cost objective."

The court recognizes that there necessarily were significant indirect costs that plaintiff incurred with respect to the contract work. Such costs likely include, for example, employer payroll taxes and rent and utilities for plaintiff's Los Angeles office. Plaintiff billed indirect overhead and general and administrative (G & A) costs of $267,148, and claims an additional $191,127 which it incurred but did not bill. But,

---

**20.** The total cost of the Humboldt Drilling settlement was $7,500, $5,030 of which plaintiff billed during the contract. Since the court has already approved this amount in its discussion of billed costs above, the court will award the difference of $2,470 here under this category.

**21.** The invoices from Pettit & Martin show billed costs totalling $21,080.23, but only $10,-000 is supported with cancelled checks and proof of payment. Of the $11,080.23 unpaid balance, $1,007.37 is clearly unreasonable, as well as unsupported, because the invoices show that these costs were incurred either to oppose defendant or Salem Plaza Condominiums on well permits or on other noncontract matters.

**22.** At trial, plaintiff presented an alternative basis for claiming post-termination costs and ar-

gued that defendant's assertion of ownership to the geothermal wells had damaged plaintiff by preventing it from exploiting the wells. However, as this court stated in *HEC I,* 26 Cl.Ct. at 17 n. 14, plaintiff presented no proof directed to this theory of damages, but instead merely claimed for a total loss of the property. Plaintiff also asserted that it had lost a substantial investment in research data it had purchased. However, the agreement plaintiff made in order to acquire the data explicitly stated that the purchase price was to be paid from 50 percent of gross receipts from the sale of geothermal energy. No persuasive evidence supports plaintiff's statement that it invested substantial sums in addition to its 3.18 percent share of project costs under the contract.

because plaintiff did not present adequate evidence to support any of these costs, this court has no choice but to deny these costs in their entirety.

*Overhead Costs*

■■ Plaintiff did not present any evidence at trial that specified the identity and precise amount of each overhead cost item plaintiff claims or that showed that the specific costs were in fact incurred. Rather, plaintiff instead relied upon the assertions of its expert that he has examined the records and has calculated plaintiff's overhead cost claim. However, plaintiff's expert admitted that his calculation was not based on a "line-by-line" consideration of the individual cost items. Instead, he calculated overhead by multiplying the direct labor costs by the 70 percent rate used by the parties, pursuant to the "Negotiated Overhead Rates" clause of the contract, in calculating the monthly billings.

This procedure is inadequate and does not support a claim for indirect overhead costs.[23] First, under the terms of the contract, the "Negotiated Overhead Rates" clause was not intended to eliminate the requirement that plaintiff substantiate its overhead costs in accordance with the regulations. The contract provides for the parties initially to negotiate a provisional rate for overhead. The contractor then receives periodic overhead payments calculated by multiplying the direct labor costs by the agreed upon provisional rate. Here, the negotiated provisional rate was 70 percent and plaintiff received payments based on that rate. However, the contract does not entitle the contractor to keep the payments

it has received without further inquiry. Instead, the contract provides for the establishing of final overhead rates and provides that all prior reimbursements for overhead shall be adjusted in the event the final and provisional rates are different. The "Negotiated Overhead Rates" clause provides, in pertinent part:

(a) [T]he allowable indirect costs under this contract shall be obtained by applying negotiated overhead rates to bases agreed upon by the parties, as specified below.

(b) The Contractor, as soon as possible but not later than ninety (90) days after the expiration of his fiscal year, or such other period as may be specified in the contract, shall submit to the Contracting Officer, with a copy to the cognizant audit activity, a proposed final overhead rate or rates for that period based on the Contractor's actual cost experience during that period, together with supporting cost data....

\* \* \* \* \* \*

(e) Pending establishing of final overhead rates for any period, the Contractor shall be reimbursed either at negotiated provisional rates as provided in the contract, or at billing rates acceptable to the Contracting Officer, *subject to appropriate adjustment* when the final rates for that period are established.

(Emphasis added.)

Plaintiff has not presented any evidence that the parties ever agreed to the 70 percent provisional rate as the final rate.[24]

---

**23.** Plaintiff initially took the position at trial that overhead and G & A costs are simply "applications of percentages." However, the government auditor refused to accept this characterization and the court finds no basis for this assertion in the contract. Indeed, plaintiff's expert himself testified that "you aren't going to find [this procedure] if you go to the audit manual. That's certainly not going to be there."

**24.** Plaintiff alleges the DCAA's audit report approved the 70 percent rate. But nothing in the report constitutes a binding amendment to the contract. Furthermore, rather than suggesting the 70 percent rate was an accurate reflection of actual costs, the DCAA's report suggests it was flawed. The report states, in pertinent part:

c. The examination disclosed questionable costs on the proposed rates for direct labor and labor overhead. The questionable costs are, however, offset by an error in calculating the proposed G & A rate. Therefore, the labor and overhead costs are not questioned in this report.

d. It is our opinion that the offeror has submitted adequate cost or pricing data and has prepared the proposal in accordance with [41 C.F.R. §] 1–15.2. Therefore, we consider the proposal to be acceptable as a basis for negotiation of a price. This statement should not be interpreted to mean that the data are necessarily accurate, complete and current in all respects in accordance with Public Law

Therefore, to prove it was entitled to receive indirect costs equal to 70 percent of direct labor costs, plaintiff was obliged to show that 70 percent was consistent with its "actual cost experience during that period, together with supporting cost data." But plaintiff has not presented any cost evidence to support its indirect costs. Thus, the court cannot even attempt to estimate whether these costs were reasonable or even allocable, *i.e.*, beneficial to the contract or necessary to the overall operation of plaintiff's business. 41 C.F.R. § 1–15.201–4. Nor can the court assess the proper share of these costs which ought to be borne by the contract. 41 C.F.R. § 1–15.203.

Given the contract and regulatory terms, it would be improper for this court to make an award based on the provisional 70 percent rate when the court has no sound reason to believe that the provisional rate reflected the contractor's actual allowable costs. Indeed, for a recently formed small business undertaking a major contract such as involved here, it would be difficult to predict with any reasonable degree of certainty what overhead costs would be expected to be incurred. Thus, in this context, a calculation based on historical data was especially important to determine the actual allowable overhead.[25]

*General and Administrative Costs*

■ Plaintiff's G & A costs claim is subject to the same criticisms as its claim for overhead costs. Plaintiff did not present evidence specifying the identity and precise amount of each G & A cost item claimed. Instead, plaintiff again relied upon the testimony of its expert. In its billings on the project, plaintiff used a G & A rate of 15 percent of all other costs (including all direct costs and overhead costs). Plaintiff's expert stated, however, that he calculated G & A costs not by the 15 percent rate but rather by examining the record of checks written by plaintiff throughout the period of the contract. After deducting direct labor, other direct costs, "transfer" items such as loan repayments, and the overhead as calculated above, plaintiff's expert asserted that 100 percent of all of plaintiff's remaining expenditures constituted allowable G & A costs.

But the court finds this expert testimony neither credible nor adequate to support plaintiff's claim of G & A costs. First, it is not apparent that the evidence upon which plaintiff's expert relied, primarily plaintiff's check register, was sufficient for him to calculate the allowable G & A costs. The government auditor apparently looked at the same check register and other underlying data used by plaintiff's expert and concluded that the information was insufficient to allocate costs to overhead or to G & A. Since plaintiff's check register is not in evidence, the court is not in a position to conclude that the government auditor's conclusion was incorrect.

■ Moreover, plaintiff's expert's approach to calculating allowable G & A costs appears to be fundamentally flawed. As explained above, his basic assumption is that after he performed his calculation, all of plaintiff's remaining expenditures necessarily constitute allowable G & A costs. But, to be allowable, it is not enough that costs be incurred (*i.e.*, that there be checks showing the money was spent), the costs also must be reasonable, allocable, and meet the additional requirements for treatment as indirect costs. It simply is not apparent that plaintiff's expert applied each of these tests to each of the costs involved. For example, indirect costs must be allocated among "several cost objectives" such as the instant contract, or other corporate activities, in the proportion that they are shown to benefit these objectives.

87–653, since a postaward audit review may disclose evidence not now discernible.

25. The court recognizes that certain overhead costs, such as the employer's share of payroll taxes, would normally be incurred by any business. However, plaintiff's expert testified that he did not recall séeing any payroll tax records.

Absent any evidence that plaintiff reported and paid its payroll taxes, the court will not award an estimate of what those taxes might have been. There is also a complete absence of evidence concerning the amounts of plaintiff's office rent, utilities, telephone, and other such costs.

41 C.F.R. § 1–15.203.[26] Plaintiff's expert apparently ignored this requirement and proceeded to charge all of the remaining costs to the instant contract.

Rather than examining each cost for reasonableness, allocability, etc., it appears that plaintiff's expert removed the fund transfers and loan repayments and then simply assumed that all other disbursements met the standards of allowability. But such a focus on the "total costs" expended is not proper. In *Boyajian v. United States*, 191 Ct.Cl. 233, 423 F.2d 1231 (1970), the Court of Claims explained:

> [T]he contractor's obligation of carrying its burden of submitting satisfactory proof of damage also includes the burden of submitting "fully substantiated * * * supporting evidence" that "its actual costs were reasonable. Consequently, it is clear that a contractor does not meet such burden simply by proving what its total expenditures were[.]

*Id.* at 254, 423 F.2d at 1243 (citation omitted) (quoting *WRB Corp.*, 183 Ct.Cl. at 426). *See also Dawson Constr. Co. v. United States*, 225 Ct.Cl. 704 (1980) [650 F.2d 290 (table)].

■■■ This is not a situation where plaintiff had no choice but to rely upon a "total cost approach." *See id.* at 711. For example, plaintiff could have put its complete check register into evidence and had Dr. Atkinson go through the alleged G & A costs item by item. Dr. Atkinson was available to identify the items of cost and explain why those items meet the regulatory requirements for treatment as indirect

costs, including how those costs benefited the instant contract.[27] But plaintiff chose its method of proof and relied upon expert testimony. This court finds plaintiff's expert testimony flawed and otherwise not credible on the issue of G & A costs and, hence, the court must deny the G & A costs in their entirety. Plaintiff did not prove that any of these costs incurred were allowable under the contract standards.[28]

## G.

The "Termination" clause of the contract states that if the total amount of allowable costs "is less than the total payment theretofore made to the Contractor, the Contractor shall repay to the Government the excess amount." As noted in *HEC I*, 26 Cl.Ct. at 9, defendant was obligated to reimburse plaintiff for 96.82 percent of the total allowable costs. By reducing the $720,031 total allowable costs calculated herein to defendant's 96.82 percent share, the court concludes that defendant was obliged to reimburse plaintiff $697,134 for allowable costs. By subtracting this amount from the $924,693 amount defendant has already paid plaintiff, the court concludes that plaintiff shall refund to defendant $227,559.[29]

*Interest*

■■■ Defendant seeks prejudgment interest dating from its demand for a refund from plaintiff. Defendant admits that no statute entitles it to this interest. Defendant cites only provisions of the Federal Acquisition Regulations (FAR), 48 C.F.R. §§ 32.614 and 52.232–17, which were enact-

26. Even though plaintiff had only one revenue-generating contract for most of the period in question, there were presumably other corporate objectives that required an allocation of these costs, such as the objective of new business development and obtaining new contracts. The regulations do not support the assertion that a contractor may allocate all of its indirect costs to one single revenue-generating contract.

27. Dr. Atkinson was thoroughly knowledgeable of plaintiff's expenditures and apparently signed each of plaintiff's checks.

28. The court recognizes that defendant did not insist on periodic calculations of G & A costs based on historical costs during the life of the

contract. However, this did not constitute a waiver by defendant of plaintiff's obligations to show the reasonableness and allocability of its claimed costs. Moreover, plaintiff did not argue that as a consequence of believing the terms were waived, it discarded or failed to maintain documentation necessary to substantiate its indirect costs.

29. Because plaintiff must refund monies to defendant, the question of whether billings for heat exchangers and other equipment should be removed from the calculation of paid costs to be counted against the contract cost ceiling is rendered moot. This question would be relevant only if the court had determined that plaintiff's allowable costs exceeded $935,300.

ed subsequent to the date on which the instant contract was terminated. Defendant has not pointed to any provision in the contract that subjects the contract to the FAR generally, much less to sections of the FAR that were enacted subsequent to contract formation or even termination. Indeed, in its initial post-trial brief, defendant chastised plaintiff for citing the FAR and correctly took the position that "[t]he Federal Procurement Regulations (FPR) and the DOE Procurement Regulations, which precede the FAR ..., dictate the outcome of this dispute." Since the court cannot award prejudgment interest based on the FAR, defendant's claim for prejudgment interest is denied.

## CONCLUSION

For the reasons set forth above, the Clerk of the Court is directed to dismiss the complaint and enter judgment for defendant in the amount of $227,559. No costs.

IT IS SO ORDERED.